UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
FRANCES FAGAN,                        :

                Plaintiff,      :    REPORT & RECOMMENDATION

            -against-           :    02 Civ. 8533 (CM)(MHD)

MICHAEL J. ASTRUE, Commissioner
of the Social Security
Administration,                      :

                Defendant.      :
--------------------------------x

TO THE HONORABLE COLLEEN MCMAHON, U.S.D.J.:


        Plaintiff Frances Fagan seeks review of the determination of

the Social Security Administration ("the SSA" or "Commissioner") on

remand that she was not disabled between July 1, 1978 and February

9, 1987 and hence not entitled to Supplemental Security Income

("SSI") benefits for that period. Fagan claims that she became

disabled, within the meaning of 42 U.S.C. § 423(d)(1)(A), in the

early 1970s and has remained so ever since.


                            Background


I. Plaintiff's Multiple Disability Claims


        Fagan has filed four applications for SSI benefits over the

past thirty years. Her first application was filed on July 11,

9/2/08 no objections having been filed and no request for any extension
granted, the Court adopts the Report as its opinion. The decision of
the Commissioner is REVERSED, plaintiff's motion for summary judgment as
to Commission is [illegible] to the Commissioner [illegible] calculation of damage

1978, and was denied at the initial level on August 30, 1978, and at the reconsideration level on December 1, 1978. (Adminstrative Record ("R.") 58). The reason for the denial is stated as "[d]isability denied on 8/30/78 and 12/1/78 resulting from a Recon Affirmation with a non-severe impairment based on Cardiomyopathy." (R. 58). She filed a second application in March 1987, and it was denied at the initial level on June 8, 1987 (R. 79). In March of 1989, Fagan filed a third application, and it was denied on October 25, 1989. (R. 79). Finally, on April 20, 1994, Fagan filed her fourth application and was found to be disabled as of December 2, 1993. (R. 79). The primary diagnosis impairment code for plaintiff's disability is recorded as "4250," indicating cardiomyopathy.[1]

Subsequently, on March 12, 1996, the SSA granted Fagan's 1987 application, finding her to have been disabled as of February 9, 1987. (R. 28). That favorable decision followed a hearing held before an Administrative Law Judge ("ALJ") pursuant to the class-action decision in State of New York v. Sullivan, 906 F.2d 910, 919 (2d Cir. 1990) (affirming order that certain unfavorable determinations of cardiovascular-disability claims be readjudicated). (Pl.'s Mem. of Law dated July 17, 2007 at 3).

_____

[1]Impairment Code "4250" is identified in the defendant's Program Operations Manual System ("POMS") as "Cardiomyopathy." See POMS, Disability Insurance, § DI 27015.065(G)(3).

2

Prior to that award of benefits, Fagan had requested that the SSA revisit its earlier denial of her July 1978 application for SSI benefits. She made that request on August 23, 1995, pursuant to the Remedial Order in Dixon v. Shalala ("the Dixon Order"), 83 Civ. 7001 (WCC) (S.D.N.Y. Dec. 23, 1993). The Dixon Order directed that claimants whose applications had been denied because their impairments were found not to be severe be given an opportunity to have their applications reconsidered. See Dixon v. Shalala, 54 F.3d 1019, 1034-35 (2d Cir. 1995). Fagan's current claim arises out of the administrative proceedings readjudicating her 1978 Dixon claim.

The SSA was unable to locate Fagan's 1978 file or to acquire records from plaintiff's treating physicians, and thus no medical records from earlier than 1986 were available for the readjudication. The Dixon Order provides that where the SSA cannot locate a Dixon claimant's file and the claimant was adjudicated disabled for a period subsequent to that which made her a member of the Dixon class, the claimant will be presumed to have been disabled if "medical evidence related to [the later favorable] decision demonstrates that, given the class member's condition at the time of the favorable decision, it is reasonable to presume that he or she was disabled as of the date of the prior administrative determination which resulted in class membership[.]" Dixon Order at ¶ 13.

3

Plaintiff argues that the ALJ committed legal error by misapplying both the Dixon Order's presumption of disability ("the Dixon presumption") and Social Security Ruling ("SSR") 83-20, which provides guidelines for determining the onset date of a disability of non-traumatic origin. She also contends that the ALJ's determination that she was not disabled during the relevant period was not based on substantial evidence. (See generally Pl.'s Mem. of Law dated July 17, 2007). The Commissioner has taken the position that the ALJ properly applied the Dixon presumption and SSR 83-20 and that there was substantial evidence to support his ultimate decision. (See generally Def.'s Opp. Mem. of Law dated September 7, 2007). We begin by reviewing the medical evidence contained in Fagan's file at the time of the readjudication.

## II. Review of the Medical Evidence

The earliest records of Fagan's medical treatment during the relevant time period are from a hospital stay at Beth Israel Medical Center, from July 12 through July 16, 1986.[2] Fagan was admitted for atypical chest pain. (R. 115). She complained of dull, throbbing chest pain for the preceding two weeks, accompanied by

---

[2]The table of contents to the administrative record indicates that Fagan was hospitalized from July 13, 1986 (R. 1). However, Fagan's examining physician signed her Progress Report on July 12, 1986 (R. 117).

4

numbness and tingling in her fingers, and sharp chest pain and tightness in her neck for one day prior to admission. (R. 117, 199). The physician noted that this was Fagan's fourth admission, and that she had a twenty-year history of hypertension, which had been controlled with medication. (R. 117). The physician recorded that Fagan had been hospitalized in 1975 and 1978 for "HTN," indicating hypertension, and in 1973 for a problem with her kidneys. (R. 117). Fagan's blood pressure upon admission was 150/100. (R. 118). Her heart rate and rhythm were regular. (R. 118). Fagan was given two nitroglycerine tablets in the emergency room. That dosage reportedly promptly relieved her pain. (R. 119).

X-rays of Fagan's chest on July 13, 1986 showed that her heart was not enlarged, her lungs were clear, and the costophrenic angles were sharp.[3] (R. 122). An electrocardiogram on the same day revealed a nonspecific T-wave abnormality. (R. 123). On July 14, 1986, a second electrocardiogram showed borderline findings. (R. 124). Cardiac isoenzyme analyses showed abnormalities in some categories.[4] (R. 126).

---

[3] A costophrenic angle is "the angle between the costal and diaphragmatic parietal pleura as they meet at the costodiaphragmatic line of pleura reflection. PDR Medical Dictionary 85 (2d Ed. 2000). "Pleura" is "[t]he serous membrane enveloping the lungs and lining the walls of the pleural cavity." Id. at 1399.

[4] Isoenzyme analysis may be used to diagnose a heart attack. National Institutes of Health, CPK isoenzymes test, in Medline

5

Fagan was given a treadmill stress test on July 15, 1986, but the results were non-diagnostic because she failed to achieve 85% of the predicted maximal heart rate and only completed three minutes of exercise. (R. 121). However, the results were positive for chest tightness. (R. 121). The examining doctor recommended cardiac catherization, but Fagan declined this procedure. (R. 116).

The cardiologist opined that the duration of Fagan's pain with no electrocardiogram evidence of ischemia weighed against a cardiac origin for the pain.[5] (R. 119). He noted, however, that Fagan's response to nitroglycerine suggested ischemia, but offered a delphic addendum that the impression was "tempered by the fact that [Fagan] is a nursing student." (R. 119-20). The record contains no explanation of the posited link between the effect of nitroglycerine and a patient's status as a nursing student, however, and there is no evidence in the record that Fagan ever was a nursing student.

---

Plus Medical Encyclopedia, available at http://www.nlm.nih.gov/medlineplus/ency/article/003504.htm (last visited July 9, 2008).

[5]Ischemia refers generally to "[l]ocal anemia due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood supply[,]" PDR Medical Dictionary at 924, and myocardial ischemia is the "inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease." Id..

6

On August 29, 1986, a state-agency medical consultant reviewed Fagan's records and, based on that review, assessed her residual functional capacity. (R. 105-06). The medical consultant concluded that Fagan had limited physical capacity, but opined that she could lift and/or carry fifty pounds maximum and twenty-five pounds frequently. (R. 105). The consultant also stated that she could stand and/or walk about six hours and sit about six hours in an eight-hour day. (R. 105). The consultant further found that she could climb, balance, stoop, kneel, crouch, and crawl occasionally and that there were no environmental restrictions. (R. 105). He observed, however, that Fagan's ability to push and pull was limited to medium work. (R. 105). The consultant described his findings as "H.B.P.," indicating high blood pressure, and "atypical chest pain." (R. 106).

On January 15, 1987, Fagan went to the Nena Health Center emergency room, complaining of dizziness. (R. 142). She denied chest pain or severe headache. (R. 142). Her blood pressure was 160/125. She was diagnosed with hypertension with poor control. (R. 142).

Fagan again sought emergency room treatment at the Nena Health Center on February 9, 1987 because of severe headaches and dizziness. (R. 141). Her blood pressure was 160/130. (R. 141). Fagan's neck was supple, and her lungs were clear. (R. 141). She had

7

normal cardiac rhythm and no significant murmur. (R. 141). It was noted that Fagan had been hospitalized twice for severe hypertension. (R. 141). She denied any chest pain. She was diagnosed with non-controlled hypertension. (R. 141). Fagan was treated with Clonidine, and her blood pressure eventually dropped to 130/98. (R. 141).

On June 10, 1987, Dr. Greeley from the Riis-Wald Family Medical Group reported that Fagan had been diagnosed with hypertension and should avoid stressful situations. (R. 143). He observed that her blood pressure had been very hard to control, and that she required bed rest and was to return seven days later. (R. 143).

On August 26, 1987, Dr. A. Martinez from the Nena Health Clinic reported that Fagan had been examined in his clinic on August 15, 1987 for dizziness and seeing spots in front of her eyes. (R. 146). Fagan reported no chest pain. (R. 146). Her blood pressure was 160/125 bilaterally, and her cardiac rhythm and pulse were regular. (R. 146). Dr. Martinez found no evidence of papilledema or hemorrhage.[6] (R. 146). Two and a half hours after Clonidine was administered, Fagan's blood pressure improved to 150/105. (R. 146). Dr. Martinez instructed Fagan to rest, take her regular medications,

---

[6]"Edema" refers to "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues[,]" PDR Medical Dictionary at 566-67, and papilledema is defined as "[e]dema of the optic disk, often due to increased intracranial pressure." Id. at 1307.

8

and return to the clinic for a blood pressure check. (R. 146).

A state-agency medical consultant examined Fagan on October 9, 1987 and indicated that Fagan's chest pain was not consistent with cardiac angina. (R. 144). He reported that a stress test in 1986 was negative submaximal,[7] and her blood pressure was not consistently elevated. (R. 144). The consultant concluded that, even if the treadmill stress test had been positive, Fagan should still not be found to be disabled because there was no evidence of characteristic angina. (R. 144). He concluded that Fagan had no restrictions. (R. 144).

On October 13, 1987, a second state-agency physician reviewed Fagan's medical records and assessed her residual functional capacity.[8] The physician concluded that Fagan could lift and/or

---

[7]The terminology "negative submaximal" is not explained anywhere in the record, nor does the record illuminate whether that interpretation is consistent with the comment by the physician who administered the stress test that its results were "non-diagnostic." Generally, however, a "negative" stress test is one that does not result in the occurrence of specific symptoms which leave little doubt that the patient suffers from coronary artery disease. Mark D. Darrow, M.D., Ordering and Understanding the Exercise Stress Test, American Family Physician, Vol. 59, No. 2, Jan. 15, 1999, available at http://www.aafp.org/afp/990115ap/401.html (last visited June 18, 2008).

[8]The table of contents to the administrative record indicates that this assessment occurred on October 3, 1987. (R. 1). However, the state-agency physician, Dr. L. H. Elstein, signed the Residual Functional Capacity Assessment on October 13, 1987. (R. 110).

9

carry fifty pounds maximum and twenty-five pounds frequently, that she could stand and/or walk about six hours and sit about six hours in an eight-hour day, and that her ability to push and/or pull was unlimited. (R. 109). The consultant further stated that she could climb, balance, stop, kneel, crouch and crawl frequently. Finally, he found that there were no environmental restrictions. (Id.).

On February 26, 1988, Dr. Alcater reported that Fagan was being treated in the Riis-Wald Family Medical Group for hypertension and routine medical care. (R. 145). She stated that Fagan's hypertension had been difficult to control and that Fagan had been hospitalized for malignant hypertension on each of three occasions on which she had examined her.[9] (R. 145).

Fagan was hospitalized at Beth Israel Medical Center from May 30 through June 1, 1990 for hypertension. Plaintiff reported headaches, visual disturbance, and numbness in her fingers bilaterally, but noted that these symptoms had resolved spontaneously. (R. 164). Fagan's blood pressure was intially recorded at 220/150. (R. 167). She was sent to the emergency room, where her pressure was noted to be 180/140. (R. 164). An examination revealed no papilledema in her eyes or edema in her extremities. (R.

_____

[9]Malignant hypertension is "severe [hypertension] that runs a rapid course, causing necrosis of arteriolar walls in kidney, retina, etc.: hemorrhages occur, and death most frequently is caused by uremia or rupture of a cerebral vessel." PDR Medical Dictionary at 856.

10

164). Her neck was supple, her lungs were clear, and her cardiac rhythm was normal. (R. 164). Fagan's blood pressure dropped to 170/90 with medication. (R. 168). An electrocardiogram was performed and showed no significant changes (R. 169), but subsequent electrocardiograms were abnormal with ST-T wave abnormalities, indicating the possibility of ischemia. (R. 172-76). Plaintiff was referred for a renal angiogram (R. 167), but refused it. (R. 169). Fagan was advised to take Advil, and was discharged. (R. 165).

On July 18, 1990, Fagan was examined at the Renal Clinic at Beth Israel Medical Center. (R. 182-92, 252-69). Because her blood pressure was high, she was referred to the emergency room. (R. 188, 192). There, her blood pressure was measured to be 200/140. (R. 186). Fagan was admitted to the hospital from July 18 through July 24, 1990. (R. 182-207, 252-69). She complained of chest pressure, headaches, visual disturbances and edema in her extremities to the degree that she could not get her shoes on. (R. 192). She was diagnosed with out-of-control hypertension. (R. 186). On July 19, 1990, an electrocardiogram showed normal sinus rhythm, but abnormal ST-T wave patterns, suggesting ischemia. (R. 200-203). Fagan was discharged with prescriptions for medication. (R. 183).

Fagan was treated in the emergency room at Beth Israel Medical Center on November 29, 1990 for high blood pressure and increased

11

chest tightness. (R. 221-26, 247-50).[10] Her blood pressure was 210/160 upon arrival. (R. 221). She reported increased chest tightness in episodes of twenty-minute duration during the last couple of weeks, which was resolved with medication and rest. (R. 221). Upon discharge, her blood pressure had dropped to 130/80. Fagan's dosage of Clonidine was increased to four times daily. (R. 221).

On May 12, 1992, Fagan underwent a cardiac ultrasound at Beth Israel Medical Center to evaluate her left ventricular hypertrophy. (R. 220, 246). Dr. Marvin Berger, who interpreted the results, concluded that Fagan suffered from dilated cardiomyopathy.[11] (R. 220).

From December 29, 1992 through January 5, 1993, Fagan was again treated at Beth Israel Medical Center, this time for complaints of cough associated with chest and back pain. (R. 208-18). Her blood

---

[10]Because pages 220-26 are missing from the transcript, citations to those pages are to the administrative transcript from Fagan's first federal proceeding, which is identical except for the absence of the second administrative hearing and decision.

[11]"Cardiomyopathy" refers generally to "[d]isease of the myocardium." PDR Medical Dictionary at 290. "Dilated cardiomyopathy" is "decreased function of the left ventricle associated with its dilation; most patients have global hypokinesia, although discrete regional wall movement abormalities may occur; usually manifested by signs of overall cardiac failure, with congestive findings, as well as by fatigue indicative of a low output state." Id.

pressure was 120/80. Her lungs were clear, and her heart rhythm was normal. (R. 208). Fagan's chest pain eventually resolved, but she continued to experience shortness of breath. (R. 218). An electrocardiogram showed normal sinus rhythm, but also showed left ventricle hypertrophy. (R. 210, 216-17, 236, 242-43). Chest x-rays indicated a probable right middle lobe infiltrate and probable left lower lobe infiltrate. (R. 215). Fagan was discharged with a recommendation to rest and to drink fluids. (R. 209).

## III. Plaintiff's Dixon Claim

### A. The Initial Decision

On March 28, 2000, the Commissioner informed plaintiff by letter that she had been scheduled for an appointment on April 4, 2000, at which she could provide the medical information necessary for the SSA to conduct a Dixon review of her previously denied 1978 claim. (R. 55-56). Plaintiff attended the appointment and completed Disability Report Form SSA-3368-BK. (R. 85-94). In that form, plaintiff stated that, beginning in 1970, high blood pressure and a heart condition had limited her ability to work. (R. 86). She stated that she had worked part-time as a nurse's aide from 1977 to 1981, but eventually stopped working entirely because of lower back pain, chest pains, and high blood pressure (R. 86-87).

13

In addition, plaintiff cited visits to the Riis-Wald Medical Center for "all medical problems" in June 1984, and to the Nena Health Center for the "same" reasons in February 1987 (R. 88). She also reported that she had been an inpatient at Beth Israel Medical Center from July 10 through July 16, 1986 for high blood pressure and chest pains. (R. 89). She listed "Dr. Kramer" as a doctor whom she continued to visit on a regular basis, initially at Riis-Wald Medical Center, and currently at Beth Israel Medical Center. (R. 89)

On April 27, 2000, the Commissioner made an unfavorable disability determination on Fagan's Dixon claim. (R. 58). The Commissioner determined that Fagan suffered from a history of cardiac impairment and hypertension, but affirmed the prior decision denying benefits "[b]ased on the information in file, no prior folder, and no medical sources for the period under review[.]" (R. 58). The Commisssioner explained to Fagan that she was responsible for furnishing evidence to support her claim, and stated that "[a]llthough we contacted your medical sources we were unable to obtain all the evidence we needed." (R. 60)

## B. Plaintiff's First Administrative Hearing on her Dixon Claim

On June 26, 2000 Fagan requested an administrative hearing, stating that "I am doing my best to provide medical evidence. SSA did not show me my old files. I don't think I had reasonable help

14

in making my case (<u>Dixon</u> case)." (R. 61). Plaintiff retained an attorney, Herbert Forsmith, Esq. (R. 153), and proceeded to a hearing before ALJ Mark Sackachefsky on December 22, 2000 (R. 21-53).

At the hearing, plaintiff's counsel first argued that the SSA had not demonstrated a good-faith effort to develop the evidence on her medical condition during the relevant period (R. 21-25). He also asserted that the Progress Notes from Beth Israel Medical Center dated July 12, 1986 indicate that she had been admitted four times prior to that admission.[12] (<u>See</u> R. 24). According to Fagan's attorney,

> [t]he medical file shows that she's had malignant hypertension. There's a reference in the treatment record, which was before Your Honor before and is [in] the file today, to four hospitalizations prior to the time that the doctor reported in '86 or '87 for control of high blood pressure, malignant hypertension. She's had, according to the medical history file with us today, at least two hospitalizations for hypertension control in the '70s.

(R. 24). Although the medical records from these prior hospitalizations were unavailable, counsel argued that they indicate malignant hypertension during the relevant time period. (R. 24). Plaintiff's memory was unclear, but she remembered being hospitalized approximately five times in the 1970s, and

_____

[12]In fact, the treatment notes from plaintiff's 1986 admission to Beth Israel Medical Center indicate that it was her fourth admission, listing three prior admissions in the 1970s. (R. 117).

15

approximately twice in the 1980s. (R. 45-46).

Next, plaintiff testified to her background and to the severity of her condition during the relevant time period. (R. 27-40). Plaintiff reported that she had worked part-time as a nurse's aide from 1977 to 1981. She initially stated that she had not worked since 1970, but after the ALJ pointed to an exhibit documenting her part-time work, she remembered that she had worked part-time as a nurse's aide from 1977 to 1981 (R. 30-31). Plaintiff explained that she was experiencing problems with her memory. (R. 31). She testified that she had been unable to work full-time because she experienced dizziness, and because her hands and feet were swollen to the extent that she was unable to wear shoes about five days a week. (R. 31-33). She testified that her doctor had advised her that the dizziness, which generally lasted from two to three hours and occurred two to three times a week, was due to her hypertension, and that she should lie down in a quiet dark environment and elevate her feet when she felt dizzy. (R. 33). Plaintiff stated that she was visiting her doctor "sometimes two to three times a week" between 1977 and 1981. (R. 31-33). She explained that she had sought medical records from Beth Israel Medical Center for these visits, but had been told that these records were unavailable. (R. 34-35).

In addition to the dizziness, Fagan reported that she had experienced tightness in her chest about once a week during the

16

period between 1978 and 1987. (R. 35-36). Fagan claimed that her symptoms had progressively worsened in 1980 or 1981, and that she had begun in that period to experience frequent difficulty breathing, both at rest and upon exertion, which her doctor advised her was because her long-term hypertension had caused her blood vessels to constrict. (R. 36-37). She also wore a back brace, and her doctors advised her not to lift more than ten to twenty pounds. (R. 38, 40). However, her work as a nurse's aide required her to lift patients. (R. 44). Fagan also claimed to have suffered from "[e]xcruciating" and continuous pain in her kidneys beginning in 1973 or 1974. (R. 50-51).

Fagan stated that between 1978 and 1987 she had not socialized with friends or relatives, attended religious services, or performed cooking, cleaning, or general housework. (R. 39). Instead, she spent her time lying down because her medication made her "very lethargic." (R. 38). Her lethargy persisted even though her doctors tried changing her medicines and her dosage. Fagan stated that during the period of time from 1978 to 1987, she could walk only one or two long blocks before experiencing tightness in her chest and severe lower back pain, and that she could stand for one hour before needing to sit down, and could sit for one hour before needing to stand. (R. 39-40).

17

Plaintiff also informed the ALJ that there were several individuals who could testify with respect to her medical condition during the relevant time period. (R. 40-42). Fagan first named Dr. Grainie, who, according to her, is currently the chief of hypertension at Beth Israel Medical Center, and had treated her over one hundred times in the past. (R. 41-42). Next Fagan named an associate who had helped her several times with errands. (R. 41) Fagan also suggested that her eldest child and a neighbor may be able to offer information. (R. 43). The ALJ agreed to keep the record open for one week to receive supplemental evidence, and to "consider that as part of the greater picture." (R. 43).

In conclusion, plaintiff's attorney argued that "malignant hypertension is generally not an intermittent problem which comes and goes and is malignant one day and she's perfectly all right the next. It has tendency to persist over a long period of time." (R. 52). The ALJ reiterated that he would keep the record open for one week, and then concluded the hearing. (R. 53).

On February 8, 2001, Fagan wrote to the ALJ and stated her intention to relinquish her attorney's services because he had failed to submit the additional evidence to the ALJ that she had provided to him. (R. 155-57). Fagan wrote:

I faxed Mr. Forsmith 2 different documents from people who wrote letters acknowle[d]ging my medical condition and assistance to me. He was suppose[d] to fax that information to your office [but] he never did. When I

18

> spoke to your assistant Mrs. Dehaney she didn't have any
> documents he was suppose[d] to have sent. He knew I had
> an extension of time to gather any additional documents
> and it was important to fax them to your office but
> didn't . . . I used my phone and my time to try and
> contact Dr. Kramer[;] he's a doctor I had for myself and
> children for thirty years. I obtained his phone number at
> his house. I called and gave this information to Mr.
> Forsmith.

(R. 156-57).

The ALJ forwarded a copy of this letter to plaintiff's attorney. (R. 154). On February 24, 2001, the attorney wrote a letter to Fagan stating that he would immediately cease representation. (R. 270). He did not explain what had happened to the two supporting letters that plaintiff had faxed to him, nor did he detail the efforts he had made to contact Dr. Kramer. (R. 270).

## C. The ALJ's First Decision

The ALJ issued an unfavorable decision on May 16, 2001. (R. 11-18). He stated that plaintiff's claim that the Commissioner had not made adequate efforts to obtain relevant records for the period at issue was without merit because "[t]he prior folder was available in this case and all relevant evidence was added to the present file." (R. 12). Upon reviewing the evidence on record, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act for the period between July 1, 1978 and February 8, 1987 (R. 12).

19

In making that determination, the ALJ utilized the five-step evaluation process mandated by 20 CFR § 416.920. (R. 12). He initially, and accurately, defined disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." (R. 12).

The ALJ then described the sequential process as follows:

If the claimant was performing substantial gainful work, she was not disabled.

If the claimant was not performing substantial gainful work, her impairment(s) must have been severe before she could be found to be disabled.

If the claimant was not performing substantial gainful work and had a severe impairment (or impairments) that lasted or was expected to last for a continuous period of at least twelve months, and her impairment (or impairments) met or medically equaled a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant was presumed disabled without further inquiry.

If the claimant's impairment (or impairments) did not prevent her from doing her past relevant work, she was not disabled.

Even if the claimant's impairments prevented her from performing her past relevant work, if other work existed in significant numbers in the national economy that accomodated her residual functional capacity and vocational factors, she was not disabled.

(R. 12-13). In applying these criteria, the ALJ found that Fagan's

part-time work as a nurse's aide did not constitute substantial gainful activity. (R. 13). He also found that Fagan suffered from severe hypertension, but that it was "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (R. 13). He determined that, during the relevant period, Fagan retained a residual functional capacity to "lift and/or carry fifty pounds occasionally and twenty pounds frequently, stand and/or walk about six hours and sit about six hours an an eight-hour day." (R. 15). Based on this determination, the ALJ found that Fagan could not perform any of her past relevant work, but also found that she had the capacity to perform medium, light, or sedentary work existing in significant numbers in the national economy. (R. 15-16). Thus, the ALJ concluded that Fagan was not under a disability as defined in the Social Security Act during the period from July 1, 1978 to February 8, 1987. (R. 15).

On May 24, 2001 plaintiff, proceeding pro se, requested that the Appeals Council review the ALJ's decision. (R. 271). In a July 10, 2002 letter to the Council, plaintiff contended that the ALJ's decision was improper because the SSA had made no attempt to obtain her Medicaid records to fill in the gaps in her medical history for the period in question. (R. 275). Fagan also noted that no one had yet obtained records from the estate of Dr. Kramer, her now deceased treating physician from approximately 1965 to 1990, and she requested that his records be subpoenaed. (Id.). In addition, Fagan

21

asserted that she had not been given the opportunity to bring in witnesses at a supplemental hearing who could testify to her ability to function during the relevant period. (R. 276). On this subject, plaintiff reported that she had suffered from malignant hypertension since the 1960's, with multiple hospital stays as a result. She stated that medication had not relieved her "pain and dizziness," and that despite her efforts at part-time employment, she had been unable to work. (Id.). On this basis, she asserted that the ALJ's finding that she was capable of medium work was erroneous. (Id.).

On July 22, 2002, the Appeals Council denied plaintiff's request for review, and the decision by the ALJ became the final decision of the Commissioner. (R. 3-4).

## D. Plaintiff's Federal Lawsuit

On October 25, 2002, Fagan commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's determination denying her benefits. On June 24, 2003, defendant moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (See Def.'s Notice of Motion dated June 24, 2003 at p.1). Defendant argued that the Commissioner's findings of fact were supported by substantial evidence and in accordance with the applicable laws and regulations. (See Def.'s Mem. of Law dated June 20, 2003 at 13-22).

22

In opposing defendant's motion, Fagan argued that defendant had committed numerous errors of law in denying her claim for SSI benefits pursuant to the Dixon remedial order. (See Pl.'s Mem. of Law dated Nov. 21, 2003 at 8-17). Specifically, she argued that 1) that the Commissioner had failed to make reasonable efforts to retrieve her original claim file, as required by Dixon; 2) that the Commissioner had failed to apply the presumption of disability, as required by Dixon; 3) that the Commissioner had failed to develop the evidence, as required by Dixon, by neglecting to contact her treating physicians; and 4) that the ALJ had failed in his affirmative obligation to develop the record by not attempting to obtain the two supporting letters Ms. Fagan had faxed to her former attorney. (See id.). Based on these arguments, Fagan also requested judgment on the pleadings.

On March 9, 2004, the Commissioner changed position and cross-moved to remand the case for further administrative action. The stated purposes for this remand were: 1) to obtain evidence from Dr. Kramer, plaintiff's retired treating doctor (at that time thought to be deceased); 2) to consider evidence contained in plaintiff's 1996 claim file; and 3) to make a documented effort to obtain plaintiff's original 1978 claim file. (See Def.'s Mem. of Law dated March 9, 2004).

23

Fagan opposed the Commissioner's motion to remand. In short, she argued 1) that remand was inappropriate due to the amount of elapsed time; 2) that defendant had failed to show good cause for remand; and 3) that the Dixon presumption of disability should be applied and benefits should be awarded. (See Pl.'s Mem. of Law dated May 20, 2004).

By Report and Recommendation dated July 29, 2004, we concluded that remand was appropriate because the Commissioner had failed to make reasonable efforts to retrieve Fagan's original claim file from her 1978 application as required by the Dixon Order, and also had failed to follow SSA's regular policies on evidence development to make initial and follow-up requests to all treating sources. Furthermore, we found that the ALJ had failed to appropriately develop the record in that he did not seek out the two supporting letters plaintiff wished to include, nor did he attempt to contact the estate of Dr. Kramer, who plaintiff believed was deceased. Finally, the ALJ failed to follow or even mention SSR 83-20. Specifically, he did not utilize the path of analysis SSR 83-20 mandates in inferring the onset date of Fagan's disability, and he also failed to seek the services of a medical advisor, which SSR 83-20 requires in cases in which a disability onset date must be inferred. See SSR 83-20; Heckler v. Edwards, 465 U.S. 870, 873 n. 3 (1984); Martinez v. Barnhardt, 262 F. Supp. 2d 40, 45-46 (W.D.N.Y. 2003); Felicie v. Apfel, 1998 WL 171460, at *3 (S.D.N.Y. Apr. 13,

24

1998). We recommended that the court require all administrative proceedings to be completed, and a final decision to be issued, within ninety days of remand. Fagan v. Barnhart, 02 Civ. 8533 (RCC), Report & Recommendation at 38-39 (S.D.N.Y. July 29, 2004).

On February 22, 2005, Judge Casey, to whom this case was then argued, adopted that Report and Recommendation with the exception of the ninety-day time limit. Fagan v. Barnhart, 02 Civ. 8533 (RCC) (S.D.N.Y. Feb. 22, 2005).

## E. Plaintiff's Second Administrative Hearing

The ALJ held a second hearing on April 25, 2006, at which Fagan was represented by new counsel. (R. 361). In that hearing, the ALJ utilized a medical expert to assist him in determining the onset date of plaintiff's disability.

The medical expert, Dr. Jose J. Rabelo, testified that between July 11, 1978 and February 8, 1987, plaintiff suffered from hypertension. (R. 369). When asked by the ALJ when plaintiff was first admitted to a hospital, Dr. Rabelo responded that July 18, 1990 was her first admission, but he was corrected by plaintiff's counsel, who pointed out that the record reflected a hospitalization from July 12 to July 16, 1986. (Id. at 369-70). Dr. Rabelo then testified that in his opinion, plaintiff did not meet or equal any

25

listed impairment between July 11, 1978 and February 8, 1987. His basis for that conclusion was, in his words, that:

> some of the admissions were for atypical chest pain, which is not angina. It's just pain. They have the cardiac enzymes in a couple of locations. The enzymes were found to be negative. They were not acute EKG changes. Her main problem that I see least see [sic] after that period is now the blood pressure has been very difficult to control. I don't know about compliance or medications. When she goes to the hospital, she's stabilized, and then she goes home. But I cannot speculate.

(Id. at 371). The ALJ then asked Dr. Rabelo whether he was talking about the 1990s, and he responded in the affirmative. (Id.).

When asked whether he expected that plaintiff's condition in the period from 1978 to 1987 would have resulted in any limitations with respect to "the physical demands of work, such as sitting, standing, walking, lifting, carrying, et cetera[,]" Dr. Rabelo stated, "If I base my remarks on this stress test, I have to limit her to like medium work."[13] (Id. at 371-72). Although Dr. Rabelo presumably was referring to the July 1986 stress test, the only one for which results were included in plaintiff's available pre-1986 medical records, plaintiff testified that she had been placed in intensive care in 1976 with a rapid heartbeat, and that she had been given stress tests five or six times but was not able to complete them. (R. 375). She further stated that she had been told that her

---

[13]We assume Dr. Rabelo was referring to the stress test administered on July 15, 1986, the only stress test for which results are included in the record. (R. 121).

difficulty completing stress tests was "related to [her] condition."
(Id.).

The ALJ eventually asked Dr. Rabelo whether he was "able to relate back any finding of disability with respect to the medical reasonableness of relating that back prior to 1987 or not[.]" Dr. Rabelo answered, "in front of a stress test which is something [INAUDIBLE] and she could perform. There was no ischemia, which means no - the coronaries were well perfused [phonetic] during the test. And she had another [INAUDIBLE] response to the test. That's all I can say." (Id. at 373-74). When the ALJ pressed him to explain the significance of plaintiff's having been hospitalized, Dr. Rabelo explained, "[w]hen a patient come[s] with chest pain to the emergency room, especially a lady with a history of hypertension, you just don't send her home. You have to work her up. Legally, you know, if you send her home, you know, it can be [INAUDIBLE]. It can be heart attack, but they do - they didn't - they have done enzymes. They have done a stress test. They have done [INAUDIBLE] EKGs on the, you know, [INAUDIBLE] from that admission, and the things have been negative." (Id. at 374). The ALJ also clarified for the record that Dr. Rabelo had no evidence prior to 1986, and that the evidence from 1986 to 1990 was "very, very scarce." (Id. 377-78).

On cross examination, plaintiff's attorney established that clonidine, dioxin, and "kaplican [phonetic]" -- which plaintiff had

testified she was taking -- are medications used to control hypertension. (R. 379-80). He asked Dr. Rabelo whether shortness of breath was a possible symptom of cardiomyopathy, to which Dr. Rabelo replied that it can be a symptom of heart disease, fatigue, anemia or "many issues[,]" explaining that a person who stays home all the time and then climbs the stairs to the subway will feel short of breath, and that some medications also produce shortness of breath. (Id. 380-81). Dr. Rabelo went on to note that shortness of breath is also common among smokers and is a symptom of emphysema. (Id. at 381).[14]

When asked whether fluid retention was a symptom of cardiomyopathy, Dr. Rabelo responded, "That - well, she's taking diuretics. Fluid retention may have to do with the - how much salt the patient is also taking in the diet." (R. 382). Finally, in response to plaintiff's attorney's query as to whether a relatively young person could develop heart disease, Dr. Rabelo stated that in the black population hypertension can appear in the early 20s, and "if it's not treated [it] has very bad prognostic signs[,]" and "[i]t mostly depends on obesity, sodium intake, family history." (Id. at 382-83). Dr. Rabelo also stated, "[o]f solid evidence to come to a medical conclusion or to make a medical statement, I don't have." (Id. at 379).

---

[14]The progress notes from plaintiff's July 1986 admission to Beth Israel Hospital indicate that at that time she was smoking half a pack of cigarettes per day. (R. 117).

28

Next, vocational expert Miriam Greene was examined by the ALJ. Ms. Greene testified that an individual who could perform medium work as defined by the Commissioner could perform plaintiff's past relevant work as a nurse's aide.[15] (R. 387). The ALJ then asked, "if the individual had all the limitations that the Claimant alleged as being accurate at that time, then I presume there would be no jobs that such an individual could perform?"[16] Ms. Greene responded that such an individual would not be able to perform any jobs available in the national economy. (R. 388).

## F. The ALJ's Second Decision

In a decision dated September 28, 2006, the ALJ determined that plaintiff was not disabled between July 1, 1978 and February 9, 1987. He found that "it was not medically reasonable to presume that the claimant was disabled in July 1978," (R. 286), and that therefore "the Dixon Remedial Order's presumption of disability [was] not applicable," (R. 287). The ALJ went on to analyze whether the presumption, if it applied, had been rebutted by evidence to the contrary. Applying Federal Rule of Evidence 301 to the Dixon presumption, he concluded that the SSA had met its burden of going forward by producing "negative evidence of the claimant's

---

[15]Neither the ALJ nor the vocational expert defined "medium" work in any greater detail at the hearing.

[16]The ALJ did not further specify which limitations he was referring to.

29

disability, including the 1986 physical findings and stress test results showing that the claimant's cardiovascular condition was less severe than alleged." (R. 287). Therefore, he reasoned, the presumption of disability dropped out of the analysis and the five-step sequential analysis governed the disability determination. (R. 287).

With respect to plaintiff's testimony, he found that plaintiff's subjective complaints were not consistent with the medical records for the relevant time period, and concluded that her testimony should be credited only to the extent that it was consistent with the ability to do medium work.[17] (R. 290, 293). This finding was based on "the objective medical findings, the claimant's treatment record, and her demeanor at the hearing." (R. 290).

Regarding the application of SSR 83-20 to determining the disability onset date, the ALJ simply stated:

In addition, I have also considered Social Security Ruling ("SSR") 83-20 in inferring an onset date of the claimant's disability, as outlined in the United States Magistrate Judge's Report & Recommendation. While I am of the opinion that the SSR is more applicable in adjudications of disability cases upon the merits rather then [sic] in conjunction with the *Dixon* Remedial Order's presumption of disability, I find, based upon the testimony of the Medical Expert at the supplemental hearing, that it is not medically reasonable to infer the onset of the claimant's 1987 disability back to 1978.

---

[17]"Medium work" is defined as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c).

Having determined both that the <u>Dixon</u> presumption did not apply
and that it had been rebutted, the ALJ went on to analyze
plaintiff's disability claim with the five-step sequential process
set forth in 20 CFR § 416.920. (<u>Id.</u>). He determined at step one that
plaintiff had not engaged in substantial gainful activity in the
relevant period (R. 288-89), and at step two that plaintiff "had the
medically determinable physical impairments of hypertensive vascular
disease with a history of obesity and renal disease...that were
'severe' and lasted for a continuous period of at least twelve
months[.]" (R. 289). At step three the ALJ found that the record did
not contain the medical findings necessary for plaintiff's condition
to meet or medically equal the requirements of the Listing of
Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (<u>Id.</u>)
Assessing plaintiff's residual functional capacity, "[b]ased on the
testimony of the Medical Expert at the hearing and the Residual
Functional Capacity ("RFC") Assessment forms completed by State
Agency physicians on August 29, 1986 and October 3, 1987[,]" he
concluded that "she would at most have been able to . . .
occasionally lift and/or carry a maximum of 50 pounds, frequently
lift and/carry 25 pounds [sic], stand and/or walk up to 6 hours in
an 8-hour workday, sit up to 6 hours in an 8-hour workday, and
push/pull up to her lifting/carrying limitations." (R. 290). At step
four, he found that plaintiff's past relevant work was as a "Nurse's
Aide" and that, based on the Vocational Expert's testimony that

31

someone who could do "medium" work could perform that job, plaintiff could have worked as a nurse's aide in the fifteen years following her last full-time job (until July 1985).[18] (R. 291). Since Ms. Fagan had no past relevant work for the period from July 1985 to February 1987, he found at step five that her residual functional capacity during that period was compatible with "medium" work as defined by 20 CFR § 416.967(c). He concluded that "a finding of 'not disabled' was directed by Medical-Vocational Rule 203.29 or 203.30 as of July 1985." (R. 293).

## ANALYSIS

### I. Standard of Review

A finding by the Commissioner of non-disability is subject only to limited review. In the absence of legal error, we must affirm the Commissioner's decision if it is based on substantial evidence, even if there is also substantial evidence to support the opposite conclusion. See, e.g., Rosa v. Callahan, 168 F.3d. 72, 77 (1999); Crespo v. Apfel, 1999 WL 144483, at *4 (S.D.N.Y. Mar 17, 1999). Substantial evidence is "more than a mere scintilla[.]" Richardson

[18]"Past relevant work" only encompasses substantial gainful activity performed during the 15 years prior to the date of disability onset. 20 C.F.R. § 416.960(b)(1). Since plaintiff ceased working full time as a nurse's aide in 1970, she had no past relevant work for the period from 1985 through February 9, 1987.

32

v. Perales, 402 U.S. 389, 401 (1971). Rather, it is defined as "such
evidence as a reasonable mind might accept as adequate to support
a conclusion." E.g., id.; Diaz v. Shalala, 59 F.3d 307, 314 (2d Cir.
1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Wagner
v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir.
1990).

When determining "whether the findings are supported by
substantial evidence, the reviewing court is required to examine the
entire record, including contradictory evidence." Brown v. Apfel,
174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d
1033, 1038 (2d Cir. 1983)). However, factual findings of the
Commissioner cannot be rejected if they are based on substantial
evidence, despite the existence of substantial evidence supporting
the plaintiff's contentions. See, e.g., Alston v. Sullivan, 904 F.2d
122, 136 (2d Cir. 1990); Rosado v. Shalala, 868 F. Supp. 471, 473
(E.D.N.Y. 1994); see also Rosa, 168 F.3d at 77; Rivera, 923 F.2d at
967. The substantial-evidence standard also applies to inferences
to be drawn from the facts. See Carballo ex rel. Cortes v. Apfel,
34 F. Supp.2d 208, 214 (S.D.N.Y. 1999).

However, this deferential standard of review does not apply to
review of the Commissioner's legal determinations. See, e.g.,
Townley v. Heckler, 248 F.2d 109, 112 (2d Cir. 1984); Glavan v.
Barnhart, 2004 WL 2326384, at *4 (E.D.N.Y. Aug, 17, 2004). Failure

33

by the ALJ to adhere to the various procedural obligations created by the courts and by the Commissioner permits judicial reversal of an administrative determination. See, e.g., Townley, 248 F.2d at 112; Glavan, 2004 WL 2326384 at *4; Jones v. Barnhart, 2002 WL 655204, at *3 (S.D.N.Y. Apr. 22, 2002). Thus, "a district court reviewing a benefits denial may not simply accept the administrative determination because a cursory review of the record reveals plausible testimony or documentary evidence or expert opinion that supports the administrative determination." Jones v. Barnhart, 2002 WL 655204, at *5. Rather, the reviewing court is obligated to carefully examine the record and the Commissioner's decision to insure that the ALJ has complied with the relevant regulations. See, e.g., id.

For the reasons that follow, we conclude that the ALJ erred in several respects in his analysis of the Dixon presumption of disability, and that his determination of non-disability was not supported by substantial evidence. We therefore recommend reversal.

II. The Dixon Decision and Remedial Order

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "[I]n evaluating a claim of disability, both objective and subjective factors must be considered." Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988). These factors include physicians' medical opinions, objective medical facts, testimony by the claimant and others regarding the claimant's subjective claims of pain, the claimant's age, work experience and level of education, her daily activities, the type of medication she takes, any measures the claimant has taken to relieve her pain, and other factors concerning the claimant's functional limitations due to pain and other symptoms. 20 C.F.R. §§ 404.1529(a)-(d); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Anderson v. Astrue, 2008 WL 655605, at *7 (S.D.N.Y. Mar. 12, 2008).

Prior to 1978, a claimant could be denied disability benefits "'where the only impairment [was] a slight neurosis, slight impairment of sight or hearing, or similar abnormality or combination of slight abnormalities.'" Dixon v. Sullivan, 792 F. Supp. 942, 944 (S.D.N.Y. 1992)(quoting 20 C.F.R. § 404.1502(a) (1968)). In 1978, the SSA mandated that the disability determination follow the five-step sequential analysis embodied in 20 C.F.R. §§ 404.1520 and 416.920, which remains in place today. Dixon, 792 F. Supp. at 944. To be awarded disability benefits, a claimant must show at step two of the five-step analysis that her impairment is "severe." Id. Step two, codified at 20 C.F.R. §§ 404.1520(c) and

35

In 1982, the Secretary issued SSR 82-255, which commanded administrators not to consider the combined effect of impairments when analyzing whether a plaintiff's impairment was severe at step 2. Dixon, 792 F. Supp. at 944. SSR 82-255 also provided ALJs with a list of 20 per se non-severe medical conditions. Id. Two years later, Congress passed the Social Security Disability Benefits Reform Act, which, in addition to other changes, added a provision to the Act instructing the Secretary to "consider the combined effect of all the individual's impairments without regard to whether any such impairment, if considered separately, would be of [sufficient] severity." 98 P.L. 460, 98 Stat. 1794, 1800 (Oct. 9, 1984). The Secretary then began to consider impairments in combination and rescinded the list of 20 per se non-severe impairments. Dixon, 792 F. Supp. at 944.

Although the Supreme Court has upheld the facial validity of the severity regulation, Bowen v. Yuckert, 482, U.S. 137, 154 (1987), in a class action titled Dixon v. Sullivan, 792 F. Supp. 942, the court found that the SSA had misapplied the regulation,

---

[19]The severity regulation states, in relevant part, "You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. §§ 404.1520(c) & 416.920(c).

resulting in the wrongful denial of disability benefits to an unknown number of claimants. Id. at 960. The Dixon court further found that the proportion of cases in which step two was misapplied to deny benefits was "grossly excessive and unacceptable." Dixon, 792 F. Supp. at 951, and that the "pattern and practice of misapplication of the severity regulation" had begun in June of 1976. Id. at 960.

The Dixon court also found that the SSA's policy of refusing to consider whether different non-severe impairments, in combination, resulted in a significant restriction of basic work activities was a violation of the Social Security Act. Id. at 956-57, 960. Finally, because "claimants were not notified and could not reasonably be expected to know that SSA adjudicators were engaging in a pattern and practice of misapplying the severity regulation[,]" the court held that the statute of limitations should be equitably tolled, a holding affirmed by the Circuit Court. Id. at 960, affirmed by Dixon v. Shalala, 54 F.3d 1019, 1031-34 (2d Cir. 1995).

On December 22, 1993, the Dixon court issued a remedial order that stated that "all persons who, between June 1, 1976 and July 19, 1983 inclusive, were issued a final denial or termination decision by the New York Office of Disability Determinations (ODD) or the Social Security Administration concerning their application for new or continued disability insurance benefits or Supplemental Security

Income payments based upon a finding that they did not have severe impairments, or that their impairments were only slight and who resided in the State of New York at the time of such decision" were entitled to relief. Dixon Order at ¶ 2. The Order directed the SSA to readjudicate the claims of all class members requesting readjudication. Id. at ¶ 5.

The Dixon court recognized that the SSA files and medical records from claims denied in the late 1970s and early 1980s might not be available due to the SSA's document-retention policies, and it consequently required the application of certain rebuttable presumptions in cases in which a class member's claim file could not be found. Dixon v. Shalala, 54 F.3d at 1035-36; Dixon Order at ¶¶ 11(c), 13. Paragraph 13 of the Order states:

> However, if records cannot be located for any class member because they have not been retained pursuant to published file retention schedules . . . or SSA is unable to locate them, the class member will be found disabled if he or she received a favorable decision awarding benefits for any subsequent period of disability . . . and 1) medical evidence relevant to that decision demonstrates that, given the class member's condition at the time of the favorable decision, it is reasonable to presume that he or she was disabled as of the date of the prior administrative determination which resulted in membership, or 2) absent evidence to the contrary, a class member was 55 years of age or older at the time of the administrative determination which resulted in class membership. If these presumptions are not overcome by evidence to the contrary and the class member is found to be disabled as a result, he or she will be found disabled from the earliest possible entitlement date based on the alleged onset date in the application which resulted in class membership.

Id. at ¶ 13. Conversely, if a claimant whose records cannot be located received a denial or termination of benefits subsequent to the denial that resulted in class membership, or was later employed for a period of more than six months and obtained earnings in excess of the minimum monthly amounts prescribed in 20 C.F.R. §§ 404.1574 and 416.974, "there will be a rebuttable presumption that [the claimant] is not disabled." Id. at ¶ 13. The Order also requires the SSA to "consider the existing evidence of record in the light most favorable to class members." Id.


III.  The ALJ's Determination that the Dixon Presumption is Inapplicable


    The plain language of the paragraph 13 of the Dixon Order requires ALJs to engage in a two-step inquiry. First, the ALJ must determine whether or not the rebuttable presumption of disability applies. As pertinent to Fagan's case, to conclude that the presumption does apply, the ALJ would have to find that 1) the SSA cannot locate or has not retained records from the claim which resulted in membership in the Dixon class; 2) Ms. Fagan was subsequently found to be disabled; and 3) based on evidence relevant to the subsequent finding of disability, and "given the class member's condition at the time of the favorable decision, it is reasonable to presume that he or she was disabled as of the date of the prior administrative determination which resulted in

membership." Dixon Order at ¶ 13. If any of these three requirements is not met, the ALJ should not apply the presumption and instead should analyze the claim with the regular five-step analysis embodied in 20 C.F.R. §§ 404.1520.

If the ALJ determines that all three requirements have been met and the presumption of disability therefore applies, the ALJ should move on to the second step of analysis -- the inquiry into whether or not the presumption has been rebutted by evidence to the contrary, viewed "in the light most favorable to" the applicant. See Dixon Order at ¶ 13. If the presumption has not been rebutted, the operation of the presumption directs a finding of disability. See id. ("[i]f these presumptions are not overcome be evidence to the contrary and the class member is found to be disabled as a result, he or she will be found disabled from the earliest possible entitlement date[.]") If it has been rebutted by contrary evidence, the ALJ should utilize the five-step analysis of 20 C.F.R. §§ 404.1520 and 416.20 to determine whether the claimant was disabled at the time of the denial of benefits that resulted in class membership.

In this case, on remand from this court the ALJ found that the first two requirements for the application of the presumption had been met, determining that the records from Ms. Fagan's 1978 claim could not be located (R. 285), and that she subsequently been found

40

to be disabled as of February 9, 1987. (R. 286). However, he
determined that it was not medically reasonable to presume that
Fagan had been disabled at the time of her 1978 application, and
thus concluded that the presumption did not apply. (R. 287).
Although this conclusion required that the ALJ undertake the normal
five-step analysis, he first went on to analyze whether the
presumption had been rebutted, and found that it had not been.
(R.287). Finally, he undertook the five-step analysis. (R. 288-92).

Although it is unclear whether the ALJ understood that he was
deviating from the Dixon Order by first rejecting the application
of the presumption and then finding it to have been rebutted, we
infer, for present purposes, that he was making -- in effect --
alternative findings about the presumption before going to the five-
step assessment. In any event, the ALJ made a series of legal errors
in his determination that it was not medically reasonable to presume
the onset of plaintiff's disability as of 1978, and in his finding
as to what quantum of evidence is required to rebut the Dixon
Order's presumption of disability.

A. Evidence Considered by the ALJ

The ALJ erred in failing to consider evidence from after 1986
in determining whether it was medically reasonable to presume that
plaintiff was disabled as of 1978. The Dixon Order is specific in

41

its command that the ALJ, when determining whether it is medically reasonable to presume that the plaintiff was disabled on the date of the denial resulting in class membership, must look to the evidence relevant to the later decision awarding disability benefits. Dixon Order at ¶ 13. In this case, the ALJ was required to consider the evidence relevant to the finding that Ms. Fagan was disabled from February 9, 1987 onward.

The few medical records that were retained from prior to February 9, 1987 were presumably relevant to whether it was medically reasonable to presume that Ms. Fagan had been disabled in 1978, since they were undoubtedly pertinent to the 1996 decision awarding her disability benefits as of 1987. However, the ALJ relied exclusively on pre-1987 evidence to conclude that it is not medically reasonable to presume plaintiff was disabled in 1978 (R. 286).[20] This was error. The ALJ readjudicated, and upheld, plaintiff's 1987 claim in 1996, when he had the benefit of post-1986 medical records upon which he relied in finding that plaintiff was disabled as of February 9, 1987:

> I find that the record is replete with medical findings (including, but not limited to, an October 1988 EKG being positive for left ventricular hypertrophy, an April 1989 EKG showing first degree A-V block, a May 1992 Echocardiogram revealing dilated cardiopathy [sic], and

___

[20]This is so even though, in the ALJ's earlier decision awarding Ms. Fagan benefits retroactive to February 9, 1987, the ALJ referred only once, indirectly, to plaintiff's pre-1987 hospitalizations. (Pl.'s Opp. Mem. of Law. dated Nov. 21, 2003 at Ex. A, p. 2).

42

a December 2000 ECG that was positive for chest pain and exercise induced atrial arrythmias and a tomographic myocardial imaging indicative of reversible myocardial ischemia of the left ventricular anteroapex) that substantiated her subjective complaints regarding her hypertension and cardiac abnormalities to the extent that I was convinced that she was not capable of performing any substantial gainful activity on a sustained basis as of February 9, 1987.

(R. 286; see also Pl.'s Opp. Mem. dated Nov. 11, 2003 at Ex. A). Thus, in adjudicating whether or not it was medically reasonable to presume that plaintiff was disabled as of 1978, the ALJ should have analyzed the significance of the post-1986 evidence that he previously cited in support of the decision finding her disabled as of February 9, 1987 rather than rely solely on the pre-1987 medical records.

## B. The Application of SSR 83-20

This case was remanded to the ALJ in 2005 with explicit instructions to apply Social Security Ruling 83-20 in determining the onset of plaintiff's disability. (See August 11, 2004 Report & Recommendation at 29-31). The purpose of SSR 83-20 is "[t]o state the policy and describe the relevant evidence to be considered when establishing the onset date of disability under the provisions of titles II and XVI of the Social Security Act (the Act) and implementing regulations." SSR 83-20. In determining the onset of disabilities of nontraumatic origin such as plaintiff's, SSR 83-20 instructs the ALJ to consider "the applicant's allegations, work

history, if any, and the medical or other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case." Id.

SSR 83-20 states that medical evidence is the "primary element" in the determination of the onset date, but "[t]he starting point in determining the date of onset of disability is the individual's statement as to when disability began[,]" which "should be used if it is consistent with all the evidence available." Id. Also, "[t]he day the impairment caused the individual to stop work[,] is frequently of great significance[.]" Id. Although Ms. Fagan did not testify to having become disabled on a precise date, she stated that she stopped working full time in 1970 because of her illness (R. 30-31), began taking diuretics in 1972 (R. 32), and was hospitalized several times during the 1970s for hypertension. (R. 45). In any event, plaintiff indicated that her disability began significantly before July 1, 1978.

Plaintiff contends that "[i]f the ALJ had applied SSR 83-20 like he was ordered to, he would have had to give significant weight to Ms. Fagan's allegations and work history." (Pl.'s Mem. of Law dated July 17, 2007 at 20). In his two-sentence discussion of SSR 83-20's application in this case, the ALJ reasoned that, based upon Dr. Rabelo's testimony, it was not medically reasonable to presume that plaintiff was disabled in 1978. (R. 288) Although he did not

explain what weight he gave plaintiff's testimony in his discussion of SSR 83-20, he later stated that her subjective complaints were not fully credible because they were not consistent with the medical record. (R. 290, 293). We begin by examining Dr. Rabelo's testimony, and then examine the ALJ's credibility finding regarding plaintiff.

## 1. Dr. Rabelo's Testimony

When assessing the weight to be given to a medical source's opinion, SSA regulations require consideration of "'(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist.'" Gonzalez v. Appel, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000) (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)); 20 C.F.R. § 416.927. In addition, ALJs are required to explain the weight given to the opinions of non-examining medical sources in their decisions. 20 C.F.R. § 416.927(f)(2)(ii).

A physician's opinion is entitled to little or no weight when it is "conclusory, inherently contradictory and based on careless factual errors." Gonzalez, 113 F. Supp. 2d at 589. Furthermore, when an opinion reflects uncertainty and is predicated on factual errors, reversal may be appropriate. Downey v. Barnhart, 294 F. Supp. 2d 495, 502 (S.D.N.Y. 2003) ("Dr. Mylod's factual errors, his

45

hesitation about giving an opinion...and his admission that he was
'not quite sure what's going on here,'...are grounds for
reversal.").

Although the ALJ did not explain the weight he assigned to Dr.
Rabelo's opinion in his discussions of either SSR 83-20 or the
applicability of the Dixon presumption, he stated in his step-four
analysis that he gave Dr. Rabelo's opinion "great weight in
accordance with the requirements of § 416.927 and SSRs 96-5p and 96-
6p." (R. 290). We find, however, that application of 20 C.F.R. §
416.927 to Dr. Rabelo's opinion should have resulted in a decision
entitling his testimony to little or no weight.

Dr. Rabelo was not a cardiologist.[21] (R. 377-78). He also had
never personally examined Ms. Fagan, and he based his testimony
solely upon an examination of the medical records available from
1986 onward. (R. 367, 378). These two factors counsel against
awarding his opinion "great weight." See Filocomo v. Chater, 944 F.
Supp. 165, 170 n.4 (E.D.N.Y. 1996) ("[t]he conclusions of a
physician who merely reviews a medical file and performs no
examination are entitled to little if any weight.").

---

[21]Dr. Rabelo stated that he was an internist in internal
medicine and that he "handle[d] cardiac cases." (R. 378).
Plaintiff's attorney stated that Dr. Rabelo's expertise was in
endocrinology. (R. 377).

In addition, Dr. Rabelo's testimony immediately revealed that he did not examine the records with care when he erroneously stated that plaintiff's first hospitalization was on July 18, 1990. (R. 369). In fact, the record contains notes from plaintiff's 1986 hospitalization, which in turn refer to three earlier hospitalizations, two of which were in the 1970s. (R. 117). Additionally, Dr. Alcater's February 26, 1988 report states that Ms. Fagan had been hospitalized on three occasions for malignant hypertension. (R. 145).

Furthermore, Dr. Rabelo's statements regarding plaintiff's condition after the period in question appear inconsistent with the SSA's own finding that she was disabled as of February 9, 1987 and with her later diagnosis of cardiomyopathy. When asked whether plaintiff met or medically equaled any listed impairment during the period between 1978 and 1987, Dr. Rabelo responded as follows:

A: No, Your Honor.
Q: And what do you base that conclusion on?
A: This is based on that some of the admissions were for atypical chest pain, which is not angina. It's just pain. They have the cardiac enzymes in a couple of locations. The enzymes were found to be negative. They were not acute EKG changes. Her main problem that I see least see after that period is now the blood pressure has been very difficult to control. I don't know about compliance or medications. When she goes to the hospital, she's stabilized, and then she goes home. But I cannot speculate.
Q: You talking about in the '90s?
A: In the '90s, yes.

(R. 371). The records from plaintiff's hospitalizations in 1990

47

· reflect ST-T wave abnormalities suggesting ischemia,[22] though we do not possess the expertise to opine as to whether those constitute "acute EKG changes." (R. 172-76, 200-03). In addition, plaintiff's 1992 cardiac ultrasound showed that she suffered from dilated cardiomyopathy. (R. 220). Although those records do not compel the conclusion that plaintiff's ailment met or medically equaled an impairment in the Listing of Impairments, Dr. Rabelo's failure to reference those findings, combined with his failure to notice that plaintiff had been hospitalized at least four times prior to 1990, counsels skepticism of his opinion. Furthermore, after giving his opinion, he stated "But I cannot speculate[,]" thereby undermining the dispositive potential of his assessment. (R. 371).

Dr. Rabelo's testimony suffers from additional problems when compared with the medical records that he supposedly reviewed and relied upon -- records that, under the Dixon Order, the ALJ was required to consider "in the light most favorable to [the claimant]." Dixon Order at ¶ 13. Several factors weigh against accepting uncritically, as the ALJ did (see R. 286), Dr. Rabelo's conclusion that based on plaintiff's 1986 stress test results she was capable of "medium work" during the period from 1978 to 1987. (R. 371-72).

---

[22]Angina is a symptom of ischemia. National Institute of Health, Angina Reference Summary, available at http://www.nlm.nih.gov/medlineplus/tutorials/angina/ct089102.pdf (last visited June 4, 2008).

48

First, the record reflects that plaintiff could not complete the stress test. (R. 121). Indeed, the physician who administered the test interpreted it as "non-diagnostic due to failure to achieve 85% of the predicted maximal HR [heart rate]."[23] (R. 121). Although a consulting physician employed by the New York State Department of Social Services interpreted the same test as "negative submaximal" and stated that "[e]ven if the treadmill [illegible] positive claimant would be a denial in the absence of characteristic angina[,]" concluding that plaintiff had "no restrictions" (R. 144), that finding plainly does not justify Dr. Rabelo's conclusion. The consultative report was completed on a date subsequent to February 9, 1987, and the SSA later found that Fagan was indeed disabled as of that date. In short, the State consultant's conclusions regarding plaintiff's ability to work must be considered erroneous.

Second, we note that the re-adjudication of plaintiff's February 1987 claim was the result of a finding in a class-action lawsuit that in denying benefits to claimants with certain cardiac illnesses, including hypertension, the SSA had improperly relied on stress tests, which frequently fail to detect disabling ischemia. Sullivan, 906 F.2d at 914 ("the treadmill test, while recommended

---

[23]Unfortunately, the ALJ did not question Dr. Rabelo about the medical significance of plaintiff's failure to complete the stress test. Thus, we are unable to determine whether the comment by the physician who administered the test that it was "non-diagnostic" precludes drawing any conclusions about plaintiff's condition from the test. (R. 121).

49

by many experts as a good diagnostic tool, results in misdiagnosis of ischemic heart disease on more than one third of occasions. An individual who does not show signs of heart disease during a treadmill test may still be severely disabled from ischemia.").

Third, Dr. Rabelo's response to the most important question for the purpose of determining the applicability of the Dixon presumption -- "are you able to relate back any finding of disability with respect to the medical reasonableness of relating that back prior to 1987 or not?" -- reflects both uncertainty and undue reliance on the non-diagnostic stress test:

> A: I cannot. I don't have --
> Q: Why cannot you --
> A: Because --
> Q: -- relate back?
> A: I --
> Q: Why do you believe it's not medically --
> A: Well, number one --
> Q: -- reasonable to relate back that disability
> A: In front of a stress test which is something [INAUDIBLE] and she could perform. There was no ischemia, which means no -- the coronaries were well perfused [phonetic] during the test. And she had another [INAUDIBLE] response to the test. That's all I can say.

(R. 373-374). Additionally, Dr. Rabelo admitted that plaintiff had exhibited symptoms of cardiomyopathy between 1978 and 1986, although he also proffered alternative, concededly speculative, explanations for her shortness of breath and fluid retention. (See R. 380-82). Exhibiting less than total confidence that plaintiff was not disabled prior to 1987, Dr. Rabelo stated on cross-examination, "[o]f solid evidence to come to a medical conclusion or to make a

medical statement, I don't have." (R. 379).

Considering Dr. Rabelo's lack of a treating relationship with Ms. Fagan, lack of expertise in cardiology, uncertainty, and reliance on the 1986 stress test to support the opinions that he did express, we conclude that the ALJ erred in assigning "great weight" to his testimony. Rather, applying the factors in 20 C.F.R. 416.927(a)-(d), the ALJ should have concluded that his testimony was entitled to little or no weight. See Downey, 294 F. Supp. 2d at 502; Gonzalez, 113 F. Supp. 2d at 589.

## 2. Ms. Fagan's Testimony

An ALJ "'has discretion to evaluate the credibilty of [a] claimant and to arrive at an independent judgment...regarding the true extent of the pain alleged[.]'" Gonzalez, 113 F. Supp. 2d at 590 n.16 (quoting Lugo v. Apfel, 20 F. Supp. 2d 662, 662 (S.D.N.Y. 1998)). However, "he must cite 'legitimate reasons' for disbelieving a claimant's testimony about his pain." Id.. Although the ALJ acknowledged that "the claimant had underlying medically determinable physical impairments that could reasonably be expected to produce some of the claimant's alleged symptoms for the period from July 1, 1978 through February 9, 1987" (R. 290), "the objective medical findings, the claimant's treatment record, and her demeanor at the hearing" led him to conclude that her testimony was credible

51

only to the extent that it was consistent with the ability, from 1978 to 1987, to perform medium work. (Id.).

There is no dispute, however, that plaintiff's 1978 application was originally denied "with a non-severe impairment based on cardiomyopathy" (R. 58), that she was later awarded disability benefits based on cardiomyopathy begining on December 2, 1993, and that the symptoms plaintiff described experiencing between 1978 and 1987 are symptoms of cardiomyopathy. In addition, in readjudicating her 1987 claim, the ALJ found that in 1987 she suffered from uncontrolled hypertension, congestive heart failure, diastolic dysfunction, anemia, and persistent headaches, which, combined, precluded performance of any substantial gainful activity. (Def.'s Mem. of Law dated Sept. 7, 2007 at Ex. A).

The only medical records other than the consultative examination that could potentially be deemed inconsistent with plaintiff's testimony are the notes from her 1986 hospitalization, which reflected conflicting evidence as to whether or not she suffered from ischemia. Although the EKG results from that hospitalization indicated that she did not have ischemia, her response to nitroglycerin indicated that she did. (R. 119-20). The attending cardiologist, Dr. Haimowitz, stated that her response to nitroglycerin suggested ischemia, but then added the cryptic comment that this was "tempered by the fact [patient was] a nursing

52

. student." (R. 120). However, Dr. Haimowitz did not explain why that status was relevant to whether or not she suffered from ischemia, and in any event there is no evidence in the record that plaintiff was ever a nursing student. Furthermore, the Dixon Order's requirement that the SSA "consider the existing evidence of record in the light most favorable to class members" when the bulk of the relevant material has been lost or destroyed by the SSA commands that we consider the evidence that plaintiff may have suffered from ischemia as corroborative of her testimony regarding her symptoms. We therefore do not see any meaningful inconsistency between plaintiff's testimony and the medical evidence. Since, without more explanation, plaintiff's "demeanor" is not in itself a reason to reject her testimony, see Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) ("If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence"), we conclude that the ALJ did not have a legitimate reason to discount Ms. Fagan's testimony.

## C. Conclusion as to Applicability of Dixon Presumption

In sum, the ALJ did not have substantial evidence for his conclusion that it was not medically reasonable to presume that

plaintiff was disabled in 1978. His primary basis for that conclusion was Dr. Rabelo's testimony, which should have been entitled to little or no weight. The ALJ should have found instead that plaintiff was entitled to the Dixon presumption, and analyzed separately whether or not the presumption had been overcome. However, since the ALJ analyzed whether the presumption had been overcome despite concluding that it did not apply, we turn to the question of whether he applied the correct legal standard in determining the quantum of evidence required to overcome the presumption, and further assess whether substantial evidence supported his conclusion that the presumption was overcome by evidence to the contrary.

## IV. The ALJ's Determination that the Dixon Presumption was Rebutted

### A. The Standard for Rebutting the Dixon Presumption

Paragraph 13 of the Dixon Order indicates that a claimant entitled to the presumption of disability should prevail unless that presumption is "overcome by evidence to the contrary[.]" Dixon Order at ¶ 13. The ALJ concluded, relying on Grella v. Barnhart, 2005 WL 1607969 (E.D.N.Y. June 14, 2005), that the Commissioner had met his burden of production of evidence of non-disability and that the presumption therefore ceased to have any effect. (R. 287). This was legal error.

Grella involved the Dixon presumption of non-disability applicable to claimants who were later denied benefits or engaged in substantial gainful activity after the denial that resulted in class membership. The Grella court concluded that the burden of production on a plaintiff who was subject to the presumption of non-disability (because he had engaged in substantially gainful activity for more than six months after the denial of benefits that resulted in his class membership) is a "light burden," consistent with Federal Rule of Evidence 301. Grella, 2005 WL 1607969, at *3-4. Whether the reasoning of Grella was correct, its analysis is plainly inapplicable in this case.

> FRE 301 states:
>
> In all civil actions and proceedings not otherwise provided for by Acts of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Fed. R. Evid. 301. Although FRE 301 does not discuss the quantum of evidence necessary to meet or rebut a presumption, subsequent cases have interpreted the burden of going forward as requiring the production of evidence that would be legally sufficient to find the non-existence of the fact presumed. See, e.g., ITC Ltd v. Punchgini 482 F.3d 135, 148 (2d Cir. 2007) (citing Wanlass v. Fedders Corp., 145 F.3d 1461, 1464 (Fed. Cir. 1998) and Joseph M. Maclaughlin, Jack

B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u> §
301.02[3][c] (2d ed. 2006)). If that burden is satisfied, the
presumption drops out of the analysis, id.; <u>Mando v. Sec'y of Health
and Human Servs.</u>, 737 F.2d 278, 282 (2d Cir. 1984), although the
inference that the presumption would have mandated may nonetheless
be drawn by the trier of fact. <u>See</u> H.R. Conf. Rep. No. 93-1597 at 2
(1974) ("If the adverse party does offer evidence contradicting the
presumed fact, the court cannot instruct the jury that it may presume
the existence of the presumed fact from proof of the basic facts. The
court may instruct the jury, however, that it may infer the existence
of the presumed fact from proof of the basic facts.")[24]

At the outset, we note that FRE 301 does not apply to
administrative proceedings, and that the ALJ was not bound by FRE 301
in interpreting the <u>Dixon</u> presumption. <u>See</u> Fed. R. Evid. 1101; 20
C.F.R. § 404.950(c); <u>Puckett v. Chater</u>, 100 F.3d 730, 734 (10th Cir.
1996); <u>McMorrow v. Schweiker</u>, 561 F. Supp. 584, 586 (D.N.J. 1982);
2 Am. Jur. 2d Admin. Law § 344 (2008). Although the <u>Grella</u> court
recognized that FRE 301 was not binding in review of disability

---

[24]As Wigmore described the burden of production required by
the Thayer approach adopted in FRE 301, "'A is absent for twenty
years, and no one at home has heard from him. That raises a
presumption of death, but in a suit to establish his death, if
some lying half-wit testified that he saw A in Singapore last
year, the presumption falls and the party is left with no
evidence to prove death as a fact.'" Neil S. Hecht & William M.
Pinzler, <u>Rebutting Presumptions: Order Out of Chaos</u>, 58 B.U. L.
Rev. at 549-50 (quoting 9 J. Wigmore, <u>A Treatise on the Anglo-
American System of Evidence in Trials at Common Law</u> § 2498(a), at
349 (3d ed. 1940)).

56

determinations, it adopted the principles of FRE 301 because the Dixon presumption of non-disability was "designed to weed out those cases in which there would be no evidence available to support the disability claim[,]" Grella, 2005 WL 1607969 at \*3, and, in its view, "[t]here is no reason...to conclude that the *Dixon* court sought to require any greater weight of evidence to rebut the presumption of non-disability" than that quantum required by FRE 301. Id. at \*4. Furthermore, the court noted that "the Remedial Order's provision requiring the 'SSA [to] consider existing evidence of record in the light most favorable to the class member,' [cite omitted], is consistent with imposing on the plaintiff only a light burden of production to rebut the presumption." Id.

In our view, whether or not Grella is correct in this respect, plaintiff's case is quite different, since it involves the presumption of disability rather than the presumption of non-disability. We conclude that the burden of production on the Commissioner in a case in which a plaintiff is entitled to the Dixon Order's presumption of disability is to produce substantial evidence of non-disability during the relevant time period -- a heavier burden than that required by FRE 301. See Neil S. Hecht & William M. Pinzler, Rebutting Presumptions: Order Out of Chaos, 58 B.U. L. Rev. 527, 549, 554 (1978).

Courts in this Circuit have faced the problem of defining the interaction between the substantial-evidence standard and a rebuttable presumption in Social Security proceedings in dealing with the presumption of death after an unexplained absence of more than seven years, and have concluded that the substantial-evidence standard for findings of fact and conclusions of law by ALJs requires production of "substantial evidence rationally pointing either to continued life or to any apparent reason for the absence." Bukawyn v. Schweiker, 567 F. Supp. 533, 534 (E.D.N.Y. 1982); accord Grossman v. Bowen, 680 F Supp. 570, 577-78 (S.D.N.Y. 1988).[25]

This view, applied to the operation of the Dixon presumption of disability, is consistent with the Order's command to "consider existing evidence of record in the light most favorable to the class member," Dixon Order at ¶ 13, as well as with the overarching purpose of the Order -- to afford relief to claimants who were unjustly denied disability benefits. Characterizing the burden on the Commissioner to rebut the presumption of disability too lightly would contravene the purpose of the presumption, which operates as an

_____

[25]Another presumption to which courts have applied standards that differ from those embodied in FRE 301 is the presumption that if the SSA has no records of wages paid for a particular time period, no wages were in fact paid. In Breedon v. Weinberger, 493 F.2d 1002 (4th Cir. 1974), the Fourth Circuit held that the presumption survived the introduction of contrary evidence and thereafter could itself constitute substantial evidence for a finding that wages were not paid. Id. at 1007; accord Fisher v. Sec'y of Dep't of Health, Educ, and Welfare, 522 F.2d 493, 497-99 (7th Cir. 1973).

58

. evidentiary substitute -- once the Commissioner produced minimal evidence of non-disability, claimants would be left with no way to prove their case in the absence of medical records from the time period in question.

Our conclusion is also consistent with Grella, which dealt with the burden of production on the plaintiff rather than the burden on the Commissioner. The provision of the Order that requires existing evidence of record to be construed in the light most favorable to the plaintiff necessarily makes the plaintiff's burden of production with respect to the presumption of non-disability a lighter one than the Commissioner's burden with respect to the presumption of disability. See Grella, 2005 WL 1607969 at *4. This result is consistent with the Dixon court's concern that plaintiffs not be penalized for the SSA's destruction of evidence, regardless of which presumption applies to them. See Dixon, 54 F.3d at 1037.

Thus, we turn to the question of whether the Commissioner produced substantial evidence that plaintiff was not disabled from July 1, 1978 to February 9, 1987.

## B. Evidence Contrary to the Presumption of Disability

The evidence that the ALJ relied on in concluding that the Dixon presumption had been overcome consisted of "the negative evidence of

.the claimant's disability, including the 1986 physical findings and stress test results showing that the claimant's cardiovascular condition was less severe than alleged." (R. 287). For the reasons discussed, we conclude the 1986 hospital records are, at best, equivocal as to whether or not plaintiff suffered from ischemia at that time, and under the Dixon Order that ambiguity must be resolved in favor of the plaintiff. In short, the ALJ did not have substantial evidence based on the 1986 hospital records and stress test to find that the presumption of disability had been rebutted.

The ALJ cited other evidence contrary to the Dixon presumption of disability in his five-step analysis -- specifically, two Residual Functional Capacity Assessment ("RFC assessment") forms completed by state agency physicians on August 29, 1986 and October 3, 1987. The August 29, 1986 RFC assessment concluded that plaintiff could lift a maximum of 50 pounds and 25 pounds frequently, stand and/or walk or sit about six hours in an eight-hour day, occasionally climb, balance, stoop, kneel, crouch, and crawl, and do limited pushing and pulling. (R. 105). The only description of the clinical basis for those conclusions is "H.B.P. & ATYPICAL CHEST PAIN". (R. 106). The October 3, 1987 RFC assessment also concluded that plaintiff could lift a maximum of 50 pounds, lift 25 pounds frequently, and stand, walk or sit for about six hours in an eight-hour day, and also found that plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl and do unlimited pushing and pulling. (R. 109). The

physician completing the 1987 RFC assessment did not provide any clinical basis for his or her conclusions. (R. 110).

It was plainly irrational for the ALJ to give any weight at all to the October 3, 1987 RFC assessment since the physician who completed it concluded that plaintiff was not disabled -- and indeed was capable of medium work -- on a date after February 9, 1987, which the SSA has already found to be the onset date for plaintiff's disability. The ALJ also did not explain why the August 29, 1986 RFC assessment should be given any significant weight considering that plaintiff was adjudicated disabled as of less than six months later. To credit the August 29, 1986 RFC assessment would require one to assume that plaintiff deteriorated from being able to perform medium work in August of 1986 to being unable to perform even sedentary work five months later, in February of 1987. While we assume that there could be a clinical basis for such a finding, the record contains not a scintilla of evidence to support such a medical collapse, and the ALJ did not ask Dr. Rabelo about the likelihood of such a rapid deterioration in plaintiff's condition.

Plaintiff's part-time employment as a nurse's aide from 1977 to 1981 also does not contradict her claim of disability. Although it shows that plaintiff was able to work a little bit, it does not, in itself, show that plaintiff would have been able to work enough hours for her employment as a nurse's aide to qualify as substantially

61

gainful activity. See Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold his endurance against him unless his conduct truly showed that he is capable of working."). Indeed, the ALJ found that plaintiff's part-time employment did not constitute substantial gainful activity (R. 289), and plaintiff testified that her dizziness, the frequent swelling in her hands and feet, tightness in her chest, difficulty breathing, pain, and the side effects of her medication made it impossible to work full time. (R. 32-39).

Plaintiff also testified that in those years she was unable to walk more than one or two long blocks without experiencing tightness in her chest and severe lower back pain (R. 39). The ALJ did not explore in questioning her whether that condition was consistent with even part-time work. It also bears mention that in her Disability Report form, plaintiff stated that each day she worked as a nurse's aide from 1977 to 1981 she walked for one hour, stood for one hour, stooped for one hour, and handled, grabbed, or grasped big objects for one hour. (R. 87). In her testimony, she indicated that during that period of time one hour was the longest she could stand before having to sit down, or sit before needing to stand. (R. 40). She did not disclose her hourly rate, but listed her yearly earnings, which were minimal, ranging from $71.25 to $1,642.07. (R. 87). Finally, plaintiff stated in the Disability Report form that in 1981 she could

no longer work at all because she could not lift patients due to "severe back pain, chest pains, & HBP". (R. 86).

## C. Conclusion as to Rebuttal of the Dixon Presumption

We conclude that the 1986 hospital records (which were equivocal about whether or not plaintiff suffered from ischemia), the incomplete stress test, and plaintiff's part-time work do not constitute substantial evidence of non-disability prior to 1987 in light of her later medical records and her testimony, and cannot permit a finding, in the face of the presumption of disability, that she was not disabled from 1978 to 1987. Furthermore, the RFC assessments, the 1987 consultative examination, and Dr. Rabelo's testimony are entitled to little or no weight. Thus, by operation of the Dixon presumption, the plaintiff should have been adjudicated disabled as of July 1, 1978.

## Conclusion

We recommend that the Commissioner's motion for judgment on the pleadings be denied, and that the plaintiff's motion for judgment on the pleadings be granted. Although remand for further administrative proceedings is often appropriate when the ALJ has applied an incorrect legal standard or failed to properly develop the evidentiary record, see Taylor v. Astrue, 2008 WL 2437770, at *4-6

(E.D.N.Y. June 17, 2008), courts may reverse the ALJ's decision and remand for a calculation of benefits "when there is persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." Parker, 626 F.2d at 235. Because this case has already been remanded once, and we have concluded that the proper application of the Dixon presumption should direct a finding of disability, another remand would serve no purpose and would cause unnecessary delay in payment to Ms. Fagan of the benefits to which she is entitled. See Balsamo, 142 F.3d at 82 (discussing the potential delays remand would engender). Thus, we recommend reversal and remand for a calculation of damages only. See Parker, 626 F.2d at 235.

Dated: New York, New York
      July 14, 2008

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

Copies of the foregoing Report and Recommendation have been mailed today to:

Salvatore A. Romanello, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Alexander W.F. Ng, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Susan D. Baird, Esq.
U.S. Attorney's Office, SDNY
86 Chambers Street, 3rd Floor
New York, NY 10007